**Darold L. HOLDEN and Mavis I. Holden, Respondents,**

v.

**CITY OF EAGAN, Appellant.**

**No. C5–86–55.**

Court of Appeals of Minnesota.

Sept. 30, 1986.

 

Arnold E. Kempe, West St. Paul, for respondents.

David G. Keller, Hauge, Eide & Keller, Eagan, for appellant.

Heard, considered and decided by LANSING, P.J., and PARKER and NIERENGARTEN, JJ.

## OPINION

NIERENGARTEN, Judge.

The trial court disallowed special assessments imposed on the Holdens' property on the ground that the improvements exceeded the benefit to the property. Eagan appeals and we reverse.

## FACTS

At issue here is the extent to which three parcels of land owned by the Holdens and identified as 030, 060, and 070, were benefited by Project 317, consisting of sanitary sewer, water, storm sewer and street improvements. The property is zoned agricultural under the city's zoning ordinances but is designated as R–III medium density townhouse under the city's comprehensive land use plan. Parcel 030 is 3.39 acres with frontage along Blackhawk Road on its west side and partial frontage along I–35E on its eastern border. Parcel 060 (.72 acres) and Parcel 070 (.55 acres) abut Parcel 030 on its south side and eastern end. The only access to the three parcels is a gravel driveway which runs from Blackhawk Road to Parcel 060 alongside the length of Parcel 030's southern border. The Holdens' residence is on Parcel 060. Two storage barns are on Parcel 070. A 150 x 54 foot pole barn is on Parcel 030.

In 1982, the city instituted a realignment of Blackhawk Road requiring installation of a water system as well as storm and sanitary sewers. The Holdens were assessed as follows:

| | |
|---|---|
| Parcel 030 | $25,319.37 |
| Parcel 060 | 711.15 |
| Parcel 070 | 1,012.85 |
| Total | $27,043.37 |

The city's appraiser testified that Parcel 030 increased in value from $15,000 per acre before improvements to $22,500 after the improvements, for a benefit of $7,500 per acre, and that Parcels 060 and 070 increased in value from $10,000 per acre to $11,500 attributable to the installation of the storm sewer only.

The city appraiser first analyzed land sales in Eagan and other comparable metropolitan communities made before utilities were installed and street improvements completed and compared those values to separate land sales where the improvements had already been made. Certain adjustments to the value were included to account for the difficulties the unique shapes of the parcels presented to future development of the property for multiple residential use. The appraisal was based on a highest and best use of the property of R–III medium density townhomes both before and after installation of the improvements. The structures on the property were not appraised because the city appraiser determined that the improvements did not alter the value of the structures.

The city appraiser concluded that Parcel 030 could be developed with townhomes despite its long narrow shape. The Holdens' appraiser testified that the value of all three parcels was $21,000 before the improvements and $22,500 after improvements, the difference being in Parcel 030. He also assumed a highest and best use of R–III both before and after improvements.

The Holdens' appraiser used comparable sales in Eagan and adjusted values upward and downward depending on the types of improvements that were already in place instead of a separate set of before and after comparables. He was unable to state how much of the $1,500 increase in value for Parcel 030 was due to streets, water, sanitary sewer, or storm sewer.

The trial court decreased the values of the assessments from $27,043.37 to $5,559.00. The court discounted the city appraiser's valuation because it did not properly appraise the value of the total property, specifically the buildings on each of the parcels. The court further noted that the valuation failed to take into account Eagan's requirements as to width and length of cul-de-sacs, factors important to future development of the parcels. Finally, the court found that the city's appraiser erred in assuming a highest and best use of the property as R–III before the improvements rather than agricultural since the city would not permit R–III development without installation of the improvements.

## ISSUES

1. Did the trial court err in finding that the highest and best use of three parcels owned by the Holdens before installation of public improvements was agricultural rather than R–III?

2. Did the trial court err in finding that the lack of value of the pole barn upon development of the property to its highest and best use reduced the benefit derived from public improvements?

## ANALYSIS

1. The scope of review in this case requires examination of the record to ascertain whether the evidence as a whole fairly supports the findings of the trial court and whether such findings in turn support its conclusion of law and judgment. *Carlson-Lang Realty Co. v. City of Windom*, 307 Minn. 368, 373, 240 N.W.2d 517, 521 (1976) (citing *G.C. Kohlmier, Inc. v. Albin*, 257 Minn. 436, 101 N.W.2d 909 (1960)).

Benefits from an improvement are calculated on the market value of the land before and after the improvement based on the highest and best use of the land. *Anderson v. City of Bemidji*, 295 N.W.2d 555, 560 (Minn.1980). Present use of the land is not the controlling factor in determining whether the land has received benefit from the improvement. Rather, the test is whether the land could be used for purposes which would benefit from the improvement. *Southview Country Club v. City of Inver Grove Heights*, 263 N.W.2d 385, 388 (Minn.1978).

■ There is insufficient evidence in the record to support a finding that the highest and best use of the property before improvements were installed was agricultural. Both appraisers assumed in their valuations that the highest and best use of the land before and after improvements was R–III.

Although the Holdens claim that the size and shape of Parcel 030 is an impediment to development, given the city's cul-de-sac and road right-of-way requirements, their appraiser agreed that the highest and best use of the property was R–III. The question then is the extent to which the size and shape of the parcel affects its value.

The city appraiser testified that the size and shape would reduce the property's value as R–III and he made a 5% adjustment in his valuation to reflect that fact, but he concluded that the property could develop as R–III. The Holdens' appraiser did not expressly include in his appraisal report an adjustment in valuation for the unique shape of the parcels but his valuation rested upon an assumption of the property as developable under R–III both before and after improvements.

■ 2. The City of Eagan argues that the loss or gain of value for the pole barn is not dependent on installation of improvements but rather depends on future development by the owner of the property.

Both appraisers concluded that the value of the buildings was not affected by the improvements.

The pole barn can still be used for raising horses even after installation of improvements. Thus, both before and after improvements its utility remains constant. The benefit derived from the improvements does however inure to the land which is obviously more valuable to a developer intending to develop it R–III than it would be before the improvements were in place. Since there was no difference in the value the buildings derived from the installation of the improvements found by either appraiser, assuming a highest and best use of R–III, the trial court incorrectly determined that the benefit should be reduced.

**DECISION**

The special assessments levied by the City of Eagan on property owned by the Holdens did not exceed the benefit derived from the improvements. Judgment entered on behalf of respondents is reversed.

Reversed.